**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1738
_____

CAROL VORCHHEIMER,
                                        Appellant

v.

THE PHILADELPHIAN OWNERS ASSOCIATION;
JUNE IDZAL; FRANK J. BONOM
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:16-cv-5145)
District Judge: Honorable Juan R. Sánchez
_____

Argued March 23, 2018

Before: HARDIMAN, BIBAS, and ROTH, *Circuit Judges*

(Filed: September 5, 2018)
_____

Stuart D. Lurie [ARGUED]
Rosenthal Lurie & Broudy
102 Pickering Way
Suite 310
Exton, PA 19341
        *Counsel for Appellant*

Christopher M. Curci [ARGUED]
Freeman Mathis & Gary
1800 John F. Kennedy Boulevard
Suite 1500
Philadelphia, PA 19103
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

BIBAS, *Circuit Judge*.

A disabled tenant has a right to a reasonable housing accommodation that she needs to use and enjoy her home. But if her landlord offers her an alternative that likewise satisfies that need, she has no right to demand the particular accommodation that she wants.

Carol Vorchheimer needs ready access to her rolling walker and wanted to leave it in her building's lobby. The building managers refused, but offered her four other ways to store and access her walker. She sued under the Fair Housing Amendments Act, claiming that her preferred accommodation was

2

necessary to equally enjoy her home. The District Court dismissed her complaint, holding that she had not plausibly pleaded necessity.

We will affirm. Necessity is a demanding legal standard. For a housing accommodation to be "necessary" under the Act, it must be required for that person to achieve equal housing opportunity, taking into account the alternatives on offer.

Here, Vorchheimer's own complaint, including the exhibits attached to it, forecloses her claim. Leaving the walker in the lobby was her preference. But given the four alternatives offered—which she herself pleaded—she did not plausibly plead that it was necessary.

## I. BACKGROUND

We accept as true the well-pleaded allegations in the amended complaint, including those in the exhibits attached to it: Vorchheimer suffers from pulmonary hypertension (high blood pressure) and other disabilities. As a result, she must use a rolling walker to get around. She owned a condominium in The Philadelphian and had a reserved parking space in front of the building. Vorchheimer would use her walker to get from her condo to the lobby and then use her cane from the lobby to her car. She could neither lift her walker, nor fold it, nor put it into her car. Instead, she began leaving her walker in The Philadelphian's lobby when she left.

One day, Vorchheimer left her walker in a corner of the lobby. A building staffer took the walker and stored it in a room behind the concierge desk. The next day, The Philadelphian's general manager, Frank Bonom, emailed Vorchheimer and

3

asked her to give her walker to the front-desk staffer whenever she left. She refused.

A year-long quarrel ensued, culminating in this case. Vorchheimer kept leaving her walker in the lobby. The Philadelphian's staff kept putting it into storage until she returned and asked for it. And Vorchheimer kept insisting that putting it away was unacceptable. Because of her disabilities, she asserted, she needed her walker to be available in the lobby upon her return so that she could independently retrieve it.

Although The Philadelphian refused to let Vorchheimer leave her walker in the lobby, it offered her four alternative accommodations. Am. Compl. ¶33 & Ex. 8. First, she could have staff store the walker and then return it to her in the lobby—she could either phone ahead to have it ready for her, or sit on a bench to await its retrieval. Second, she could have a staffer deliver the walker to her car before she got out of it. Third, she could have the doorman load the walker into and take it out of her car's trunk. Or finally, she could start parking in the building's indoor valet-parking garage, where she could leave her walker near the valet station. But Vorchheimer rejected all these alternatives and insisted that she needed to leave her walker in the lobby.

To support her demand, Vorchheimer gave the building's managers several letters from her doctors. In the first two, her doctors detailed her medical issues and wrote that "[h]er use of a rolling walker is a medical necessity." *Id.* Exs. 4 & 7. In the third, her doctor reiterated that she needs to "have ready access to her walker or scooter" and that she should "not [be] required to stand [a]waiting assistance for any period of time." *Id.* Ex. 9.

4

The doctor noted management's offer to bring the walker to Vorchheimer's car. But he considered it "preferable to simply have her walker readily available to her in the building lobby." *Id.* This way, she could "maintain[ ] her independence" and not risk having to stand and wait for someone else to get the walker. *Id.*

Neither side would budge. So Vorchheimer sued Bonom, The Philadelphian Owners' Association, and the Association's then-president, June Idzal. She alleged that the defendants were violating 42 U.S.C. § 3604(f) by refusing to let her leave her walker in The Philadelphian's lobby so she could retrieve it by herself. And she attached to her complaint her doctors' letters and her correspondence with the building's managers.

The District Court dismissed Vorchheimer's complaint. It acknowledged that "keeping her equipment in the lobby may be Plaintiff['s] preferred accommodation." App. 2 n.1. But she had not plausibly alleged that it was necessary. App. 3 n.2. So, the Court held, "Defendants' storage … and prompt retrieval of [her walker] when she returns does not deny Plaintiff a full and equal opportunity to enjoy her housing." *Id.* Vorchheimer's amended complaint added nothing material, so the District Court dismissed again based on lack of necessity. App. 5 n.1. Vorchheimer then filed this appeal and later moved out of The Philadelphian.

## II. STANDARD OF REVIEW

We review de novo the dismissal of a complaint for failure to state a claim. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). In doing so, we construe the

5

complaint in the light most favorable to the plaintiff. We accept all factual allegations as true and draw all reasonable inferences in her favor. *Id.* To survive a motion to dismiss, a complaint must contain enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining whether Vorchheimer's claim is plausible, we consider not only her complaint, but also the exhibits she attached to it, including her doctors' letters and The Philadelphian's correspondence proposing alternative accommodations. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### III. TO BE "NECESSARY," A HOUSING ACCOMMODATION MUST BE REQUIRED TO ACHIEVE EQUAL HOUSING OPPORTUNITY IN LIGHT OF THE ALTERNATIVES OFFERED

The Fair Housing Amendments Act forbids housing discrimination against the disabled. One of its key provisions bans "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of [that person's] handicap." 42 U.S.C. §3604(f)(2), (f)(2)(A). "[D]iscrimination includes":

> [1] a *refusal* to make
> [2] *reasonable accommodations* in rules, policies, practices, or services,
> [3] when such accommodations may be
>> [a] *necessary* to afford such person
>> [b] *equal opportunity* to use and enjoy a dwelling[.]

6

42 U.S.C. §3604(f)(3), (f)(3)(B) (line breaks, numbers, and emphases added).

Under this subparagraph, a plaintiff can state a claim by pleading all three elements. This case turns on the first half of the third element: whether a requested accommodation is necessary. That is an independent requirement, one we must now define.

**A. The statutory text requires an accommodation be essential to achieve equal housing opportunity, measured against any alternatives that were offered.**

We begin with the text. We look to the statutory provision's language and to the ordinary meaning of the words it uses. *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018). Dictionaries, statutes, case law, treatises, literature, and even songs cast light on the ordinary meaning of "necessary." These sources tell us at least three things: First, "necessary" means "required." It is a high standard. Second, we must consider what is necessary to satisfy the particular disabled person's need. This statute pegs necessity to affording this disabled person equal opportunity to use and enjoy her dwelling. And third, we must gauge necessity in light of proposed alternatives.

1. *"Necessary" means required, indispensable, essential.* "Necessary" is a "word[ ] of limitation." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004). As an adjective, it means "[i]ndispensable, requisite, essential, needful; that cannot be done without," or "absolutely required." 10 *Oxford English Dictionary* 275-76 (2d ed. 1989); *Webster's Third New International Dictionary* 1510-11 (1966). The other sense

of the adjective is causal: "Inevitably determined or fixed by predestination or the operation of natural laws; happening or existing by an inherent necessity." 10 *Oxford English Dictionary* at 275-76.

Necessary's dictionary definitions reflect the word's ordinary meaning. Consider its use in formal logic: a necessary condition is something essential for something else to be true. *See* 10 *Oxford English Dictionary* at 276; Irving M. Copi et al., *Introduction to Logic* 471 (14th ed. 2011). For example, lemon juice is a necessary condition for making lemonade.

In keeping with these definitions, English speakers distinguish desired goods from necessary ones. Thoreau categorized the "necessaries of life" as "Food, Shelter, Clothing, and Fuel." Henry David Thoreau, *Walden* 14 (Courage Books 1990). "*[N]ext to* necessaries," he ranked only "a few implements, a knife, an axe, a spade, a wheelbarrow, etc., and for the studious, lamplight, stationery, and access to a few books." *Id.* at 15 (emphasis added). And years before he became president, Lincoln contrasted alcohol with staples like "flour, beef, bacon, or any other of the real necessaries of life." Abraham Lincoln, Temperance Address, Springfield, Illinois (Feb. 22, 1842).

So the word "necessary," without more, is stringent. When it is not followed by an object, as it is in this statute, English speakers and writers typically reserve "necessary" for our physiological needs and perhaps our needs for health and safety. *Cf.* A.H. Maslow, *A Theory of Human Motivation*, 50 Psych. Rev. 370 (1943) (describing these as the foundational and second levels of Maslow's hierarchy of needs). Necessities

do not include conveniences and creature comforts, much as they are desirable or even helpful.

True, we sometimes speak loosely, confusing our wants with our needs. Children may declare, "I need candy." Adults may groan that they need a beer or a vacation. But wants are not needs. Parents remind their children that, while they want candy, they do not need it. So too with beers and vacations. As The Rolling Stones put it: "You can't always get what you want / But if you try sometimes you might find / You get what you need." The Rolling Stones, *You Can't Always Get What You Want*, *on Let It Bleed* (London Records 1969). And though we sometimes use the verb "need" loosely, we do not do the same with the adjective "necessary." Nor does Congress write statutes with such loose, colloquial phrasing.

Like ordinary English speakers, the common law uses "necessary" in this strict sense of essential or indispensable. In contract law, "the predominant rule is that a minor's contracts are generally voidable but that contracts for what are known as 'necessaries' are enforceable." *Rodriguez v. Reading Hous. Auth.*, 8 F.3d 961, 964 (3d Cir. 1993) (Alito, J.). "[C]ourts have traditionally viewed what constitutes necessaries narrowly." 5 Richard A. Lord, *Williston on Contracts* §9.19 (4th ed. 1993 & May 2018 update). The classic necessities are "food, clothing, and shelter," and at least a basic education. *Id.* Ordinary food qualifies, though candies and fruit do not. Ordinary clothing qualifies, but elegant clothing and jewelry do not. A majority of courts hold that cars and trucks do not qualify, nor even bicycles. *Id.* And while shelter qualifies if a minor's parent or

guardian will not provide it, buying a house or furniture does not. *Id.*; *Rodriguez*, 8 F.3d at 964.

When writers wish to tighten or loosen the degree of necessity, they add modifiers. Describing a necessity as "absolute," "logical," "physical," or "bare" constricts the necessity required even more. But when Congress wants to loosen necessity to mean just "sufficiently important," it uses the phrase "reasonably necessary." *E.g.*, *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) (interpreting 18 U.S.C. § 3599(a)). Or it pairs "necessary" with a looser term to include what is merely fitting or preferable. So Congress, in the All Writs Act, authorized courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a).

Congress even used "necessary or appropriate" in another section of this Act. That provision authorizes the Secretary of Housing and Urban Development to "collect such information … as the Secretary determines to be necessary or appropriate." 42 U.S.C. § 3608(e)(6). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). Congress knew how to broaden "necessary" by adding "or appropriate" in § 3608(e)(6), but chose not to do so in § 3604(f)(3)(B). Each statute is different, however, and the text, structure, or context of another provision may suggest a different interpretation or degree of necessity. Our holding today is limited to this particular provision of the Fair Housing Amendments Act.

The statute applies "when such accommodations may be necessary," but "may" does not change our analysis. 42 U.S.C. § 3604(f)(3)(B). Vorchheimer cites a few district-court decisions that imply that the conditional "may" waters down the degree of necessity, requiring only a probability of necessity. *E.g.*, *Kuhn ex rel. Kuhn v. McNary Estates Homeowners Ass'n*, 228 F. Supp. 3d 1142, 1149 (D. Or. 2017); *Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer*, 6 F. Supp. 3d 1272, 1281 n.11 (S.D. Fla. 2014). That is not so here. In this statute, "may" signals not a low probability of necessity, but rather the conditional mood. The condition, when met, makes the accommodation necessary, as in the phrase "as the case may be." "[W]hen such accommodations may be necessary" in § 3604(f)(3)(B) is another way of saying "whenever they are necessary" or "as far as they are necessary."

In short, the Act's necessity element requires that an accommodation be essential, not just preferable.

2. *We must gauge necessity in light of the goal of achieving equal housing opportunity.* Necessity tracks an underlying need or goal. Sometimes that goal is implicit; "necessary" without more often implies "necessary for survival." Sometimes, it is explicit. The word "necessary" is often followed by "to" or "for," specifying the need. Fuel, oxygen, and a spark are necessary to build a fire. A medical degree is necessary to practice medicine.

Here, the Act tells us what to look for: an "accommodation[ ] … [that] may be necessary to afford [the disabled] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The text pegs the necessity to the goal of

11

providing the particular tenant with equal housing opportunity. "[T]he object of the statute's necessity requirement is a level playing field in housing for the disabled." *Cinnamon Hills Youth Crisis Ctr. v. St. George City*, 685 F.3d 917, 923 (10th Cir. 2012). "Think of the blind woman who obtains an exemption from a 'no pets' policy for her seeing eye dog, or the paraplegic granted special permission to live on a first floor apartment because he cannot climb the stairs." *Id.* The blind woman's need is a way to navigate to and around her apartment. The paraplegic's need is a way to get to his apartment. Once we identify the particular tenant's need, we can gauge what is necessary to afford that tenant equal housing opportunity.

3. *One must also consider the alternatives on offer to gauge whether they satisfy the statutory goal.* Giving the paraplegic a first-floor apartment is one way to give him access and thus equal opportunity to use his apartment. But an elevator would work too. That alternative would give him access to every apartment, so a first-floor apartment would no longer be necessary. The landlord has to offer at least one of the accommodations, but not both. If she does offer one of them, she has not "*refus[ed]* to make reasonable accommodations … [that] may be necessary to afford [the tenant] equal [housing] opportunity." 42 U.S.C. §3604(f)(3)(B) (emphasis added). In that vein, food is necessary to survive. But if soup and salad are on offer, a sandwich is not necessary. Gauging necessity, then, requires considering whether another alternative on offer satisfies the goal of equal housing opportunity for that tenant.

Consideration of the alternatives has long been built into the common law's analyses of necessity. For example, in criminal law, the defense of necessity justifies breaking the law, but only if there is no "reasonable, legal alternative to violating the law." *United States v. Bailey*, 444 U.S. 394, 410 (1980); *accord* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.1(d)(5), at 172-73 (3d ed. 2017 & Oct. 2017 update). Torts has a similar defense, and it also considers alternatives. *See Restatement (Second) of Torts* § 196 cmt. d (1965). In double jeopardy, the manifest-necessity doctrine allows judges to declare mistrials. But, except in cases of jury deadlock, courts must first consider alternatives to doing so, such as granting continuances or giving curative jury instructions. 6 Wayne R. LaFave et al., *Criminal Procedure* § 25.2(c)-(d), at 798-804 (4th ed. 2015); *see, e.g.*, *United States v. Jorn*, 400 U.S. 470, 487 (1971) (plurality opinion). And the doctrine of easement by necessity grants the owner of a landlocked parcel a right of way to reach a public road. *E.g.*, *Leo Sheep Co. v. United States*, 440 U.S. 668, 679 (1979). Traditionally, the "necessity giving rise to the easement must be 'absolute,' affording no alternative means of ingress and egress." *Kapp v. Norfolk S. Ry. Co.*, 350 F. Supp. 2d 597, 610 (M.D. Pa. 2004); *see also* John G. Sprankling, *Understanding Property Law* § 32.05[B][3][a], at 554-55 (4th ed. 2017).

Section 3604(f)(3)(B) likewise requires courts to consider alternatives. Two district-court decisions illustrate this consideration. In one, a disabled tenant was unable to drive her handicapped-accessible van over speed bumps. So it was necessary that her building's parking lot have one entrance without a speed bump, but not that both of its entrances lack speed

13

bumps. *See Resnick v. 392 Cent. Park W. Condo.*, No. 07-cv-1988, 2007 WL 2375750, at *2 (S.D.N.Y. Aug. 14, 2007). In the other case, a disabled couple needed on-site parking. So it was necessary that this couple have one parking spot, but not two. *See Temple v. Hudson View Owners Corp.*, 222 F. Supp. 3d 318, 324 (S.D.N.Y. 2016). "While having only one parking space may be less convenient for Plaintiffs [than having two], the law does not require defendants to provide the best possible accommodation" or plaintiffs' preferred accommodation. *Id.* When defendants have already provided an adequate alternative, "[they] need not adopt plaintiff's preferred means of accommodation." *Resnick*, 2007 WL 2375750, at *2.

Of course, the proffered alternatives must still satisfy the remainder of the subsection's third element: affording equal housing opportunity. That may require more than "just those accommodations that are absolutely necessary for the disabled individual's treatment or basic ability to function." *Anderson v. City of Blue Ash*, 798 F.3d 338, 361-62 (6th Cir. 2015). To qualify as alternative "reasonable accommodations," the accommodations must afford the particular disabled person equal opportunity both to use and to enjoy her home. An accommodation that does not provide *equal* opportunity, or that provides equal opportunity to *use* but not to *enjoy*, will not satisfy that requirement.

So courts must weigh whether the tenant's requested accommodation and the landlord's proposed alternative afford equal housing opportunity. Whether the accommodations do so depends on that particular tenant's abilities and disability,

14

which may require a fact-intensive inquiry. But all the proffered alternatives that afford equal opportunity to use and to enjoy housing bear on whether a specific accommodation is necessary.

Beyond those observations, we need not offer detailed guidance on how judges and juries should compare various alternatives. We leave those details for another day. And, as we discuss below, a plaintiff need not plead or hypothesize alternatives to state a claim or establish a prima facie case.

### B. Precedent supports this reading.

1. *Our precedent.* This reading of § 3604(f)(3)(B) comports with our precedent. The Supreme Court has not defined the necessity element. And most of our cases on this provision have addressed other elements, not necessity. Our decision in *Hovsons* addressed the reasonableness element and who bears the burden of proving it, not what is necessary. *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1103-06 (3d Cir. 1996). More recently, we applied the refusal element, not necessity. *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 110-12 (3d Cir. 2017).

The one time that we have applied the necessity element, we equated "necessary" with "required." *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment*, 284 F.3d 442, 461 (3d Cir. 2002). In *Lapid-Laurel*, we held that, to establish necessity, the plaintiff had "to show that [the requested zoning variance] is *required* to make [the proposed nursing home] financially viable or medically effective." *Id.* (emphasis added). In other words, the plaintiff had to prove "that the size of the proposed facility

15

either would be necessary for the facility's financial viability (and therefore necessary to give the handicapped an equal opportunity to live in a residential neighborhood) or would serve a therapeutic purpose, (and would therefore be necessary to ameliorate an effect of the handicap)." *Id.*

We described that test as "[a] strict interpretation of the 'necessity' requirements." *Id.* Applying that "strict interpretation," we held that no reasonable jury could have found that the requested variance was necessary. *Id.* But because the case involved zoning variances, it focused on what was necessary to build and situate a nursing home in the first place. We had no occasion to consider an individual tenant's request for accommodations or the relevance of a landlord's proffered alternatives.

Vorchheimer, however, reads *Lapid-Laurel* differently. She asks us to distill a much weaker test of necessity from an earlier passage, in which we block-quoted a Fourth Circuit opinion: "'And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be "necessary."'" *Id.* at 460 (quoting *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 604 (4th Cir. 1997)).

But that sentence did not define necessity. All the quoted sentence did is set forth a threshold criterion. Its double-negative construction means only that an accommodation is *un*necessary when it does *not* directly ameliorate a disability's effect. That does not mean that an accommodation *is* necessary just because it *does* ameliorate a disability; it must "ameliorate [the] *effect* of the handicap" on the achievement of equal housing opportunity. *Lapid-Laurel*, 284 F.3d. at 461 (emphasis

16

added). A beverage without lemon juice cannot be said to be real lemonade. But lemon juice alone does not lemonade make; it needs other ingredients, like water and a sweetener, in the right proportions. So that sentence did not weaken *Lapid-Laurel*'s test.

2. *Other circuits.* Likewise, sister-circuit precedent adopts the strict sense of "necessary." As then-Judge Gorsuch recognized, "necessary" in § 3604(f)(3)(B) bears its ordinary meaning: "The word implies more than something merely helpful or conducive. It suggests instead something 'indispensable,' 'essential,' something that 'cannot be done without.'" *Cinnamon Hills*, 685 F.3d at 923 (quoting 10 *Oxford English Dictionary* at 276). "Put simply, the statute requires accommodations that are necessary (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without." *Id.*

Other circuits make the same point using the language of causation. Necessity functions as a but-for causation requirement, tying the needed accommodation to equal housing opportunity. An accommodation is necessary if, "without the accommodation, the plaintiff will be denied an equal opportunity to obtain [or use, or enjoy] the housing of her choice." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006) (en banc); *accord id.* at 754-55 ("cause-in-fact" and "but for" cause); *Anderson*, 798 F.3d at 361 ("but for … causation inquiry" (internal quotation marks omitted)); *see also Lapid-Laurel*, 284 F.3d at 460 (quoting other circuits' cases adopting a "but for … causation requirement"). *Cf. Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289

(11th Cir. 2014) (upholding a jury verdict for plaintiff because, "without the [emotional-support] dog [sought], [plaintiff's] social interactions would be so overwhelming that he would be unable to perform work of any kind" (internal quotation marks omitted)). In short, these precedents confirm our, and *Lapid-Laurel*'s, reading of the plain text.

### C. HUD's informal guidance does not change the plain meaning of "necessary."

Vorchheimer argues that alternative accommodations are irrelevant to analyzing necessity. She relies on a Joint Statement of the Department of Housing and Urban Development and the Department of Justice, *Reasonable Accommodations Under the Fair Housing Act* (May 17, 2004). But it does not aid her cause.

The passage of the Joint Statement to which she points does not define necessity. It advises landlords to heed disabled tenants' requests and superior knowledge: A landlord may "believe[ ] that, while the accommodation requested by [a disabled person] is reasonable, there is an alternative accommodation that would be equally effective." App. 116. Because a disabled person "typically ha[s] the most accurate knowledge about [her own] functional limitations … [she] is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable." *Id.* This may well be prudent advice. But it does not purport to interpret the statutory requirement of necessity.

Even if one read the Joint Statement as bearing on necessity, it would be unpersuasive. It is not a notice-and-comment regulation, but a guidance letter. So it does not merit *Chevron* deference. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (discussing the limits of *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-44 (1984)). It merits "'respect'" under *Skidmore*, but "only to the extent that [its] interpretations [of the statute] have the 'power to persuade.'" *Id.* (quoting and applying *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Some of *Skidmore*'s factors weigh in Vorchheimer's favor. The Joint Statement was issued fourteen years ago, and we have no reason to believe that it is "[in]consisten[t] with [the agency's] earlier and later pronouncements." *Skidmore*, 323 U.S. at 140. Even so, it is unpersuasive on this point. The passage does not purport to parse or define the statutory requirement of necessity, nor to consider what that word means in common parlance or in other areas of law. So it neither "thorough[ly] … consider[s]" nor "valid[ly] … reason[s]" about the particular statutory requirement of necessity. *Id.* It cannot overcome the plain meaning of the word, which requires courts to consider the alternatives on offer.

## IV. Vorchheimer Did Not Plausibly Plead Necessity, So Dismissal Was Proper

### A. Necessity is amenable to dismissal.

Vorchheimer argues that necessity is so fact-specific, and so divorced from the alternatives on offer, that it is never amenable to dismissal—or even perhaps summary judgment. We disagree. As we have explained, the necessity element has a

19

legal meaning. And that legal meaning requires considering the alternatives.

Our holding today in no way raises or shifts the pleading requirements or burden of proof for housing-discrimination claims. We do not require plaintiffs to hypothesize alternatives, let alone to preempt hypotheticals. Nor do we change how courts should treat these claims, including the necessity element, on a motion to dismiss. To survive a motion to dismiss, a plaintiff need only plausibly plead enough facts to make out the three elements set forth in § 3604(f)(3)(B): refusal, reasonable accommodation, and necessity/equal opportunity.

Plaintiffs need not, and generally do not, plead alternative accommodations. So, ordinarily, district courts do not have alternatives before them on a motion to dismiss. Assessing alternatives typically requires a factual record, and developing that factual record requires discovery.

But this is not an ordinary case. Vorchheimer did not just plead facts supporting the statutory elements, including her disability and her requested accommodation. She also specifically pleaded the four alternative accommodations in her complaint. Am. Compl. ¶ 33.a-d. She attached Idzal's correspondence (on behalf of The Philadelphian) outlining them. *Id.* Exs. 5, 8. And she attached four doctors' letters that detail her disabilities and medical needs. *Id.* Exs. 4, 7, 9, 12. As exhibits to her own complaint, these materials were appropriate to consider on a motion to dismiss. *See Mayer*, 605 F.3d at 230; *see also* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2004 & Supp. Apr. 2018). They do not require going "outside the pleadings." *See* Fed. R. Civ. P. 12(d). And if her own exhibits

contradict her allegations in the complaint, the exhibits control. *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010); *see also Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (rejecting, on a motion to dismiss, factual "assertions [that were] belied by both the remaining factual allegations and the law").

Finally, this appeal arises on a motion to dismiss, not a motion for summary judgment. Nothing in our opinion adds elements to a plaintiff's prima facie case or alters the burden-shifting framework that we apply at summary judgment. *See Lapid-Laurel*, 284 F.3d at 459; *Hovsons*, 89 F.3d at 1103.

**B. Vorchheimer did not plausibly plead that her requested accommodation is necessary in light of the alternatives offered.**

Although Vorchheimer asked to leave her walker in the lobby, she did not plausibly plead that it was necessary. Her own doctors' letters establish two medical necessities. First, while she can "walk[ ] (with the assistance of a cane) the short distance from her car to the lobby," "her use of a rolling walker is a medical necessity" to get from the lobby to and from her apartment. Am. Compl. Exs. 7, 9**.** So she needs "ready access to her walker or scooter." *Id.* Ex. 9. Second, she needs to "[m]inimiz[e] her periods of unsupported standing." *Id.* Ex. 7. "Even just standing, for periods as brief as 5 minutes, result[s] in the occurrence of progressive symptoms." *Id.*

All four of the proffered alternatives, however, satisfy both of these medical needs. Staff could retrieve the walker from

storage to the lobby, while Vorchheimer sits on a bench, or retrieve it before she arrives if she calls ahead. Am. Compl. ¶¶30, 33.a & Exs. 5, 8. A staffer could bring the walker to her car. *Id.* ¶33.b & Ex. 8. The doorman could fold the walker, load it into her car, and unload and unfold it upon her return. *Id.* ¶33.d & Ex. 8. Or she could park in the indoor valet-parking garage and leave her walker there. *Id.* ¶33.c & Ex. 8. On their face, all four of these alternatives offer her "ready access to her walker or scooter" and "[m]inimiz[e] her periods of unsupported standing." *Id.* Exs. 7, 9. Not one requires her to stand without support.

Nor, though Vorchheimer amended her complaint, did she plausibly plead the contrary. Her only suggestion that the alternatives are inadequate is half a sentence in a footnote at the very end of her brief, citing three paragraphs of her amended complaint. Br. 21 n.5 (citing Am. Compl. ¶¶34-35, 39). The cited paragraphs allege at least four occasions on which she left her walker in the lobby and had to stand and wait for front-desk staff to retrieve it. But in none of the examples she gives did she seek to use The Philadelphian's alternatives; each time, she neither used the bench nor called ahead. *See* Am. Compl. ¶¶35, 39. She alleged no problem with calling ahead to the front desk, having a doorman bring the walker to her, having a doorman load and unload the walker from her car, or using valet parking. Nor did she allege that she ever tried any of these options.

Vorchheimer also alleged a third medical necessity: preserving her "functional independence." Am. Compl. ¶¶20, 23, 32, 34, 48, 69, 70, 78. She claims that if she cannot herself get the walker in the lobby, she might have to wait for it, increasing

her stress. But those allegations of necessity are conclusory and contradicted by her own exhibits. Her doctors' letters do not state that independent access is necessary. On the contrary, Dr. Palevsky repeatedly described it as "preferable" or "medically preferable." *Id.* Exs. 9, 12. It causes Vorchheimer less stress, which her doctor described as desirable. "When faced with two potential solutions, the one that permits the patient to retain her independence is the better option." *Id.* Dr. Palevsky was careful to distinguish her needs from her preferences. So are we.

Even if it were necessary for Vorchheimer to retrieve her walker independently upon her return, a satisfactory option was on the table. Idzal offered to let her park in the indoor valet-parking garage, "where [she] could leave [her] rolling walker in close proximity to the pick-up and drop-off spot for [her] vehicle." Am. Compl. Ex. 8. Vorchheimer's only quibble with the valet-parking option is that she would have to "relinquish her coveted, designated outdoor parking space." Am. Compl. ¶33.c. But nothing in the Act gives her a right to her preferred option. Wants are not needs.

One final note: If a civil-rights complaint fails to state a claim, a district court must grant leave to amend the complaint unless amendment would be futile or inequitable. *Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017). But here, Vorchheimer had already amended her complaint once and did not move to amend again or suggest what she might add. The District Court concluded that further amendment would be futile. We agree.

\* \* \* \* \*

Carol Vorchheimer preferred to have access to her walker without having to wait for a staffer. But she did not plausibly plead that she needed to leave it in the lobby. To enjoy her home, she needed access to her walker without having to stand for minutes. She pleaded four alternatives on offer that, on their face, satisfied those needs. And she attached doctors' letters that distinguish her needs from her preferences. Because the Act guarantees her only a "reasonable accommodation" that satisfies her needs, not the particular accommodation that she wanted, we will affirm.