**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2769
_____

AFFINITY HEALTHCARE GROUP VOORHEES, LLC; DR. KENNETH BROWN,
Appellants

v.

TOWNSHIP OF VOORHEES; VOORHEES TOWNSHIP ZONING BOARD; ZONING
OFFICER JACLYN BRADLEY; VOORHEES TOWNSHIP PLANNING BOARD
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 1-21-cv-00800)
U.S. District Judge:  Honorable Renee M. Bumb
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 16, 2024
_____

Before: SHWARTZ, MATEY, and PHIPPS, <u>Circuit Judges</u>.

(Filed:  January 18, 2024)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

SHWARTZ, Circuit Judge.

Plaintiffs Affinity Healthcare Group Voorhees, LLC and its member, Dr. Kenneth Brown, ("Affinity") appeal the District Court's order granting summary judgment to Defendants[1] on claims that Voorhees Township's handling and denial of its applications to operate a methadone clinic violated the Americans with Disabilities Act ("ADA"), Rehabilitation Act ("RA"), and Equal Protection Clause, and deprived it of substantive due process. Because Affinity has failed to adduce evidence upon which a reasonable jury could conclude that the Township's conduct violated these laws, we will affirm.

I.

Affinity provides counseling and medication-assisted treatment ("MAT"), such as methadone, to outpatients with Opioid Use Disorder ("OUD"). The Township approved Affinity's initial zoning application and issued a certificate of occupancy and a permit to operate a "professional office providing behavioral health services on an outpatient basis"[2] in a building across the street from an elementary school.[3] The building is in the "O1 Office 1 Zone," for "[o]ffices of a recognized profession, including . . . medicine[.]"

---

[1] Defendants are the Township of Voorhees, the Voorhees Township Zoning Board (the "Board"), Township Zoning Officer Jaclyn Bradley, and the Voorhees Township Planning Board. Collectively, we refer to Defendants as the "Township."

[2] The application did not mention an intent to administer MAT to OUD patients. See App. 128. After Affinity submitted the application, but before the Township approved it, Affinity delivered to Elaine Powell, the then Township Zoning Officer, materials detailing the MAT services it planned to provide, which specifically set forth Affinity's intent to: (1) use methadone, (2) have nine employees, (3) operate seven days per week from 4:30 a.m. until 2:00 p.m., and (4) occupy a building that could treat up to 600 patients.

[3] The permit allotted Affinity twenty of the eighty-one parking spots,

Voorhees, N.J., Twp. Code § 152.052(A) (2021).[4] The purpose of this zone is "to provide for office uses on small lots" to "create a transition zone between residential uses and more intensive commercial or industrial uses." Twp. Code § 152.051. The Township Code has separate zones for, among other things, medical clinics and hospitals.[5]

Affinity then applied to the New Jersey Department of Health ("NJDOH") for a license to operate its treatment facility. NJDOH denied the application because Affinity failed to submit: (1) a certificate of occupancy that described the facility as an "Opioid Treatment Program"; and (2) proof "that [it] notified [the Township] of the full scope of

---

[4] A year before Affinity's application, the Township permitted Recovery Centers of America ("RCA") to operate an opioid treatment facility in a building in the O-1 Office 1 Zone located across the street from a daycare center. RCA planned to offer scheduled outpatient counseling services to all patients as well as medications, including vivitrol and suboxone, but not methadone, to under fifty percent of its patients. RCA expected to operate from Monday through Friday, from 9:00 a.m. to 9:00 p.m., and on Saturdays, from 9:00 a.m. to 5:00 p.m., and to treat between twenty-five and seventy-five patients per day. RCA further explained that the traffic impact of its office would "be minimal" and that to get to the facility patients would "drive[,] . . . get dropped off, [or] utilize public transportation [or] . . . RCA's provided car service[.]" App. 487. Unlike its requirements for Affinity, the Township did not require RCA to (1) seek a use variance, (2) produce a certificate of need, (3) provide a traffic study, or (4) appear before the Planning Board.

[5] See Twp. Code §§ 152.102 (A), 103(A) (reserving "Major Business Zone" for "medical professional offices, doctors [sic] offices, professional hospital support facilities," including "hospitals, ambulatory surgical centers, medical clinics, medical offices and the like") (capitalization altered); § 152.132(L) (designating "Township Center Zone" for "medical and dental clinics, nursing homes and hospitals").

services, including opioid treatment, to be provided at the [property]." Dist. Ct. ECF No. 74-26 at 20 (quoting N.J.A.C. § 10:161B-11.1(a)).[6]

Affinity then submitted a second zoning application to the Township's Zoning Administrator, Jaclyn Bradley, explaining in a letter affixed to the application, that it needed a certificate of occupancy containing the state-required language.[7] The second application represented that Affinity intended to use the property as a "Medical Office/Opioid Treatment Center," App. 152, but provided no other details about the services it intended to offer. Bradley denied Affinity's second application because of technical problems with the building's exit signs and the next day she asked Affinity for a more detailed description of the facility's services and operations. Bradley said that she hoped to "process the resubmission quickly" and that she had sought the Zoning Board's solicitor's expertise in evaluating the application. App. 179. Five days later, Bradley reminded Affinity of her request and inquired specifically about the facility's "hours of operation, number of employees, [and] number of doctors and patients on-site during peak time(s)[,] [so as to] verify that there [would be] sufficient parking[.]" App. 520. The record does not reveal whether Bradley received the requested information.

Affinity eventually contacted Chris Norman, the Zoning Board's Solicitor, and submitted a third application identical to its second one. Norman directed Affinity to

---

[6] The Administrative Code also requires opioid treatment programs to "[m]eet all applicable local . . . zoning and other codes for the siting of an opioid treatment program[.]" N.J.A.C. § 10:161B-11.1(a)(7).

[7] Around that time, Affinity also submitted materials detailing the MAT services it planned to provide to the Township Administrator.

4

provide a "description of the proposed use" so that Bradley could determine "whether [it would] be similar to a medical office in terms of land use impacts."[8] App. 212. The following day, Affinity emailed Norman, but not Bradley, materials describing its use of methadone, hours of operation, and expected number of employees and patients. Around the same time that day, Bradley advised Affinity that (1) it had provided her with only "generic information" about the facility; (2) the Township "verif[ies] that [a] site . . . contains sufficient parking for the proposed use," and "[she] was informed that" facilities like the one apparently proposed by Affinity "typically do not operate like a standard medical practice with scheduled appointments," but instead "function more similarly to a retail[er]" whose "peak parking demands are accommodated by larger [] lots"; and (3) because "the proposed change of use appear[ed] to be significantly different than the previously permitted uses on [the] site," Affinity needed to obtain a change of use from the Planning Board, in accordance with § 156.018 of the Township Code.[9] App. 246.

---

[8] Norman also informed Affinity that it was "free to file an application for zoning interpretation under N.J.S.A. § 40:55D-70(b) [on] whether the proposed opioid treatment constitutes a medical office use." App. 213.

[9] Under the Township Code,

(E) The [] Board will . . . conduct a public hearing on the proposed change of use application. The applicant will be responsible to clearly state all aspects of the proposed use of the property.

(F) . . . The reviewing board will make a final determination on the application . . . based on the testimony provided to the reviewing board. Failure of the reviewing board to act within the prescribed time period shall constitute approval of the application.

(G) The reviewing board may condition a change of use approval upon compliance with any reasonable condition not in violation with the terms of this chapter or other applicable local, state, or federal law.

Twp. Code § 156.018(E)-(G).

Affinity then applied to the Board for a change of use.[10]  Four public hearings ensued, during which Affinity's witnesses testified that: (1) the facility anticipated treating between 200 and 275 patients per day, eighty to ninety percent of whom would arrive between 5:00 a.m. and 9:30 a.m. ("Peak Hours"); (2) during Peak Hours, between fifty and seventy-five percent of patients would be triaged by one of three nurses, receive oral medication, and then leave; (3) approximately twenty-five percent of patients during Peak Hours would undergo that same process and a drug screen; (4) treatments during Peak Hours would "take more than a minute," App. 1112, with a typical treatment lasting no more than five to ten minutes, although some could last up to twenty-five minutes; and (5) after Peak Hours, approximately six patients per day would receive counseling. Affinity's traffic expert, David Shropshire, testified that neither the facility's anticipated Peak Hours, nor its patients' pattern of arrivals and departures, are typical of a traditional medical office.[11]  Shropshire explained that "[b]ecause of the uniqueness of" Affinity's facility he did not use data from the Institute of Transportation Engineers ("ITE") in his traffic analysis for Affinity, even though ITE "[has] a category of use for medical

---

[10] Before the hearing, Voorhees residents emailed the Township expressing their view that the treatment facility (1) would increase illegal activity, and (2) was located too close to an elementary school.

[11] Shropshire also issued a written report, which concluded that (1) Affinity's facility would have "minimal impact on the adjacent roadways"; (2) there would be "more than sufficient[] parking," assuming a "total available parking supply of 78 spaces on-site"; and (3) eighty vehicles would arrive at different times during a peak hour.  App. 654-55.  These observations do not account for the fact that Affinity would be assigned only twenty of the parking spots in the lot and that it has nine employees.

6

offices[.]" App. 1205-06. He instead used traffic metrics from an addiction treatment facility located in a neighboring town to predict the traffic flow to Affinity's location.

Separately, during one hearing, Board Solicitor Stuart Platt asked Affinity whether "there [were] any [] conditions that [Affinity] would proffer or agree to on [its] application," to which Affinity responded that it would be open to the Board's imposing a 275 patient-per-day limitation, but that Affinity could not then agree to any other conditions. App. 1452.[12]

The Board unanimously voted to deny Affinity's application based on the facility's high traffic, lack of sufficient parking, and commercial nature. In its final resolution, the Board expounded that "the intensity of the proposed use [and] unique hours of operation" made the facility "the equivalent of a medical clinic," a use "not permitted in the 'transitional and less intensive' O-1 Zoning District, but rather in only

---

[12] Affinity also presented two doctors who testified about the serious nature of the opioid crisis. The Board also permitted eight members of the public to comment during the final two hearings, all of whom opposed the facility, mostly based on their personal view that it would attract illicit drug users, increase crime, or pose harm to elementary schoolers.

The Board members asked many questions, including about the: (1) need for increased security at the facility, (2) consequences of locating the facility near an elementary school, (3) use of intravenous needles in providing treatment (which was a mistaken assumption as the provided treatment is oral), (4) side effects of methadone, and (5) whether OUD patients are susceptible to being "preyed on by . . . those in the [illicit] drug trade." App 1138-39. As explained herein, these areas of inquiry do not show that the Board's decision was based on anything other than the volume of activity at the facility and the land use impact.

the more commercial [Major Business] and [Township Center] Zoning Districts."[13] App. 447.

II[14]

Affinity sued the Township, alleging (1) disparate treatment, disparate impact, and failure to accommodate in violation of the ADA and RA; (2) selective enforcement under the Equal Protection Clause; and (3) a violation of the substantive due process guarantees of the Fifth and Fourteenth Amendments. On cross-motions for summary judgment, the District Court determined that Affinity's claims failed because: (1) an intention to exclude OUD patients did not motivate the Township's handling or denial of Affinity's applications, (2) the Township had legitimate reasons for denying the applications, (3) Affinity failed to show that the Township could reasonably accommodate the facility in its selected location, and (4) Affinity did not show that the Township's decision to deny it the right to use the leased property shocked the conscience. See generally

---

[13] Because the Board found that Affinity's proposed use "for a medical clinic is not a permitted use in [its preferred] [z]one," it concluded that it lacked jurisdiction to grant relief and told Affinity that it could "apply to the Voorhees Zoning Board of Adjustment . . . [for] use variance approval, pursuant to . . . N.J.S.A. [§] 40:55D-70d." App. 449.

[14] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1334. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review of the District Court's order granting summary judgment. Resch v. Krapf's Coaches, Inc., 785 F.3d 869, 871 n.3 (3d Cir. 2015). We apply the same standard as the District Court, viewing facts and drawing all reasonable inferences in the non-movant's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010).

Affinity Healthcare Grp. Voorhees, LLC v. Twp. Of Voorhees, 624 F. Supp. 3d 494 (D.N.J. 2022).  Affinity appeals.[15]

## III

### A

The ADA and RA prohibit discrimination based on disability.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.[16]  An ADA claim may proceed under any of the following theories of liability: (1) disparate treatment or intentional discrimination, (2) disparate impact, or (3) failure to make a reasonable accommodation.  See Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 176 (3d Cir. 2005) (Fair Housing Amendments Act ("FHAA") case); see also Hansen Found., Inc. v. Atlantic City, 504 F. Supp. 3d 327, 334-

---

[15] Because Affinity presented no substantive arguments challenging the dismissal of its state law selective enforcement and New Jersey Law Against Discrimination claims, those claims are forfeited.  See Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993) (failure to "set forth [an] issue[] on appeal and to present [an] argument in support of [that] issue[] in [one's] opening brief" generally amounts to "abandon[ment] and waive[r of] that issue . . . and it need not be addressed by the court of appeals." (internal quotation marks omitted)); see also United States v. Hoffecker, 530 F.3d 137, 162 (3d Cir. 2008) (holding that "a one-sentence footnote falls far short of meeting the requirement that an appellant raise an issue in his [or her] opening brief or else waive the issue on appeal"). Even if we were to consider those claims, they would fail for the reasons set forth herein.

[16] Because "the ADA simply expands the [RA]'s prohibitions against discrimination into the private sector, [and] Congress has directed that the two acts' judicial and agency standards be harmonized," New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 302 (3d Cir. 2007) (citation omitted), the same analysis applies in this case to Affinity's RA claim.

35 (D.N.J. 2020) (stating that courts use the FHAA framework to examine to ADA and RA claims). To evaluate claims brought under these theories, "courts [] typically adopt[] the analytical framework of their analogues in employment law," which requires that if a plaintiff satisfies the elements of the prima facie case of discrimination, then the burden shifts to the defendant to show it had a legitimate, nondiscriminatory reason for its action. 431 E. Palisade Ave. Real Estate, LLC v. City of Englewood, 977 F.3d 277, 284 (3d Cir. 2020) (quoting Wind Gap, 421 F.3d at 176).

1

To establish a prima facie case for discrimination, "a plaintiff must show that he is a qualified individual with a disability; . . . was excluded from a service, program, or activity of a public entity; and . . . was excluded because of his disability." Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs., 796 F.3d 293, 301 (3d Cir. 2015) (internal quotation marks and citation omitted). The parties here do not dispute that (1) Affinity's patients suffering OUD are qualified persons under the ADA and RA, New Directions, 490 F.3d at 308-09 & n.11; (2) the Township is a public entity that provides services, 42 U.S.C. § 12131(1)(A); (3) services include access to treatment; and (4) a zoning ordinance can result in an exclusion from such services, see New Directions, 490 F.3d at 305 (holding that a law "singl[ing] out methadone clinics for different zoning procedures" facially violates the ADA).

The parties dispute only whether "some discriminatory purpose" to exclude OUD patients from receiving MAT "was a motivating factor behind" the Township's procedures and denial of Affinity's applications. Wind Gap, 421 F.3d at 177 (internal

10

quotation marks and citation omitted). The record does not provide a basis for a reasonable jury to conclude that it was. As a preliminary matter, the Township Code is facially neutral insofar as it does not single out methadone clinics or OUD patients. Moreover, the Township did not subject Affinity's application to atypical procedures. As to the zoning application process, the Township approved the first application based on Affinity representing that it intended only to operate a "[m]edical office," App. 213. It then accepted a second application, which (1) resulted from Affinity's failure to comply with NJDOH's certificate of occupancy and notice requirements, and (2) contained a revised description of the proposed use, namely "Medical Office/Opioid Treatment Center," without any other details about the facility's operations, App. 152. It then denied the second application for technical reasons related to the facility's exit signs but, in light of the second application's revised use description, twice requested additional information about the facility's practices and land use impacts. When Affinity submitted a third application that mirrored the land use information in the second application, the Township denied this application after Affinity failed to send Bradley the information that she had twice requested.

Affinity then applied for, and the Board considered, a change of use.[17] The Board reviewed written materials and testimony which showed that, unlike traditional medical offices, the facility was "the equivalent of a 'medical clinic,'" a use not permitted in the O-1 Zoning District, as reflected by its unique hours of operation and high volume of

---

[17] Affinity also opted not to appeal Bradley's denial of its application. See N.J.S.A. § 40:55D-70.

11

activity, which could result in increased traffic and parking problems.  For example, the facility would receive as many as 245 unscheduled patients daily, between 5:00 a.m. and 9:30 a.m., with the first permit allotting Affinity only twenty parking spaces in its lot to accommodate its patients and employees.  Affinity's own expert acknowledged the facility's "uniqueness" and relied on traffic metrics from a nearby addiction treatment facility to predict the traffic flow to Affinity's location, rather than on traffic data for traditional medical offices.  Based on these facts, the Board concluded that the volume of activity and traffic impact was inconsistent with the O-1 Zoning District.

Neither the Board's questions, nor objections from residents, which may have been based on a misunderstanding of OUD patients and treatments, show that the Board's decision was motivated in any way by anti-OUD patient bias.  The Board's questions reflect an effort to understand Affinity's services and probe the traffic and parking issues presented by the number of patients expected to visit each day during the Peak Hours.  Additionally, there is no evidence that the residents' comments impacted the Board's

decision.  Because Affinity has not shown that discriminatory intent motivated the

Township's decision,[18] it has not established a prima facie case of disparate treatment.[19]

2

Affinity has also failed to adduce evidence to support a disparate impact claim.[20]

"[T]o make a prima facie case of disparate impact . . . [a] plaintiff must show that the

Township's action had a greater adverse impact on [a] protected group"—here, patients

with OUD—"than on others."  Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of

Twp. of Scotch Plains, 284 F.3d 442, 466-67 (3d Cir. 2002).  Proof of discriminatory

intent is not required.  Id. at 466 (citing Doe v. City of Butler, 892 F.2d 315, 323 (3d Cir.

1989).  If the plaintiff succeeds in offering evidence of a measurable disproportionate

---

[18] Further undermining Affinity's disparate treatment claim is the fact that one year before denying its zoning application, the Township approved RCA's application to operate an addiction treatment office in a building located across the street from a daycare center.  In contrast to the 160 to 245 unscheduled patients that Affinity expected to treat between 5:00 a.m. and 9:30 a.m., RCA expected to treat between twenty-five and seventy-five patients during appointments scheduled between 9:00 a.m. and 9:00 p.m.  The Township's approval of RCA and denial of Affinity's applications support the conclusion that the Township did not act to exclude individuals with OUD, but rather sought to uphold the purposes of the zone in which Affinity sought to operate.

[19] Affinity also brings a selective enforcement claim.  To maintain a selective enforcement claim, a plaintiff must show: (1) "the administration of [a facially neutral policy] . . . resulted in 'unequal application to those who are entitled to be treated alike,' . . . [and (2)] 'an element of intentional or purposeful discrimination'" on the part of the defendant.  PG Pub. Co. v. Aichele, 705 F.3d 91, 115 (3d Cir. 2013) (quoting Snowdon v. Hughes, 321 U.S 1, 8 (1944)).  Affinity's selective enforcement claim fails because (1) Affinity has not adduced evidence upon which a reasonable jury could conclude that the Township's decision to deny its application was motivated by an intent to discriminate against OUD patients; and (2) the Township's approval of RCA's application demonstrates its openness to opioid treatment facilities in the Township.

[20] No party here disputes that Affinity's RA claim may proceed under a disparate impact theory.

13

impact, "then the burden shifts to the defendant to show that it had a legitimate, non-discriminatory reason for the action and that no less discriminatory alternatives were available." Lapid-Laurel, 284 F.3d at 467 (citing Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 149 (3d Cir. 1977)). If the defendant makes such a showing, "the plaintiff may still carry his burden of persuasion by demonstrating that a feasible, yet less onerous alternative exists." NAACP v. Med. Ctr., Inc., 657 F.2d 1322, 1334-35 (3d Cir. 1981).

Even assuming the Township's denial of Affinity's applications had a disproportionate effect on OUD patients who would benefit from having access to a methadone clinic in the zone, the Township has set forth legitimate reasons for its conduct and has not otherwise erected hurdles that bar Affinity from seeking a permit to operate in another zone in Voorhees. Moreover, when asked whether "there [were] other conditions" besides limiting its patient count to 275 per day[21] to which Affinity would agree, and that might allow the Township to accommodate Affinity's request, Affinity's counsel stated: "[n]one that I can — none that I'm [allowed] to discuss at this point[.]" App. 1457. No other alternatives were ever offered. Because Affinity did not carry its burden to show that "a feasible, yet less onerous alternative exists," NAACP, 657 F.2d at 1335, its disparate impact claim fails.[22]

---

[21] This sole condition does not constitute a reasonable requested accommodation because that figure did not address the Board's land use concerns.

[22] For similar reasons, Affinity's reasonable accommodation claim fails. To state a prima facie case for such a claim, Affinity must show that the Township refused to make a reasonable accommodation in the Township Code when such accommodation may be necessary to afford the requestor equal opportunity to use the facility. Vorchheimer v. Philadelphian Owners Ass'n, 903 F.3d 100, 105-06 (3d Cir. 2018)

14

B

Affinity also has not demonstrated that the Township violated its substantive due process rights. To state a substantive due process claim, Affinity must show that the Township "shock[ed] the conscience" by depriving Affinity of a protected property interest. Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).[23] None of the Township's conduct, including its application processes and the Board members' written and oral communications before, during, or after the hearings, shocks the conscience. Accordingly, this claim fails.

IV

For the foregoing reasons, we will affirm.

---

(applying this standard in FHAA case); see also Yates Real Estate, Inc. v. Plainfield Zoning Bd. of Adjustment, 404 F. Supp. 3d 889, 915, 918-19 (D.N.J. 2019) (applying this standard in ADA case). Even assuming Affinity made a prima facie showing, for the reasons already stated, Affinity did not offer any reasonable accommodations that would allow it to operate, mindful of the land use concerns the Township identified.

[23] See also United Artists Theatre Cir., Inc. v. Twp. of Warrington, 316 F.3d 392, 399-400 (3d Cir. 2003) (observing that "only the most egregious official conduct" shocks the conscience (internal quotation marks and citation omitted)); DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 600 & n.9 (3d Cir. 1995), overruled on other grounds by United Artists, 316 F.3d at 401 (noting that "ownership is a property interest worthy of substantive due process protection").

15