**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1830
_____

EUGENE MICHAEL FREIN; DEBORAH FREIN,
                                        Appellants

v.

PENNSYLVANIA STATE POLICE; PIKE COUNTY
DISTRICT ATTORNEY'S OFFICE; RAYMOND TONKIN;
JOHN/JANE DOE I–V
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:20-cv-00939)
District Judge: Honorable Malachy E. Mannion
_____

Argued: March 23, 2022

Before: BIBAS, MATEY, and PHIPPS, *Circuit Judges*

(Filed: August 30, 2022)
_____

Curt M. Parkins                [ARGUED]
COMERFORD LAW
538 Spruce Street, Suite 430

Scranton, PA 18503

*Counsel for Appellants*

Sean A. Kirkpatrick             [ARGUED]
PENNSYLVANIA ATTORNEY GENERAL'S OFFICE
Strawberry Square, 15th Floor
Harrisburg, PA 17120

*Counsel for Pennsylvania State Police*

David J. MacMain             [ARGUED]
MACMAIN CONNELL & LEINHAUSER
433 West Market Street, Suite 200
West Chester, PA 19382

*Counsel for District Attorney Pike County & Raymond J. Tonkin*

————————————

OPINION OF THE COURT

————————————

BIBAS, *Circuit Judge*.

Although police may seize potential evidence using a warrant, they may not keep it forever. Yet they did that here. After a man assassinated a Pennsylvania State Trooper and injured another, troopers seized his *parents*' guns. The government never used the guns as evidence. And eight years after the crime, once the son lost his last direct appeal, the officers still refused to return them—even though the officers do not claim that the parents or the guns were involved in the crime.

Because the parents were never compensated, they have a takings claim. And because they lawfully owned the guns, they have a Second Amendment claim too. But since they had a real chance to challenge the government's keeping the guns, they got procedural due process. So we will affirm in part, reverse in part, vacate in part, and remand.

## I. BACKGROUND

Eric Matthew Frein is on death row for cold-blooded murder. In 2014, he ambushed two Pennsylvania State Troopers, killing one and injuring the other. For a while, he evaded capture. Police knew he had used a .308-caliber rifle. So they got a warrant to search the home that he shared with his parents and seize that type of rifle and ammunition.

When they executed the warrant, state police did not find a .308-caliber rifle. Instead, they found forty-six guns belonging to the parents: twenty-five rifles, nineteen pistols, and two shotguns. None was a .308. Even so, the officers got a second warrant and seized them all.

Eventually, the long arm of the law caught Frein. He was arrested, tried, convicted, and sentenced to death. His conviction was affirmed on direct appeal and certiorari was denied. But throughout that long process, the government never used the guns it had seized from the parents—not at trial, at sentencing, or on appeal. Plus, it never arrested or charged the parents and never alleged that any of their guns was involved in the crime. So the parents went to Pennsylvania state court and asked to get their guns back, raising Second Amendment,

takings, due-process, excessive-fines, and state-law objections. In a one-sentence order, their motion was denied.

The parents now sue the state police, its officers, the Pike County District Attorney, and its prosecutors under 42 U.S.C. § 1983. The parents do not challenge the seizure under the Fourth Amendment. But they say that by keeping the guns after the criminal case ended, the government is violating two other parts of the Constitution: the Fifth Amendment's Takings Clause and the Second Amendment's right to "keep … Arms." Plus, they argue that the state's procedure for letting them reclaim their property violated procedural due process.

In response, the officials concede that they never used the guns at trial or on appeal. They claim that they might need the guns as evidence if Frein's state habeas (technically, PCRA) or federal habeas petition yields a new trial, but can only speculate about how they might use them. And they stress that they seized the guns under a valid search warrant. The District Court agreed and dismissed their suit for failure to state a claim.

Now the parents appeal. We review de novo. *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018).

## II. BY KEEPING THE PARENTS' GUNS AFTER THE CRIMINAL CASE ENDED, THE OFFICIALS TOOK THEIR PROPERTY FOR PUBLIC USE WITHOUT COMPENSATING THEM

Start with the Fifth Amendment claim. The parents correctly charge the government with taking their "private property … for public use, without just compensation." U.S. Const. amend. V. They challenge *not* the searching officers'

4

initial seizure under a warrant, but the state police's continued retention of the guns once the criminal case ended.

### A. The parents have stated a takings claim

The Fifth Amendment's text supports the parents. After all, their guns are "private property." And they were "taken" by the officials. Plus, the parents have never gotten a dime, let alone "just compensation." *Id.*

Finally, the officials pressed the property into "public use." *Id.* The parents' property was seized by public officials (police) to help public prosecutors enforce state law at a public trial. So their claim checks all the Fifth Amendment boxes.

The officials counter that because the parents have tried to get their guns back in state court, they are collaterally estopped from using a takings claim to try again. Not so. The state court's order would preclude this takings claim only if the state court had decided an "identical" issue. *Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 351 (3d Cir. 2014). But that one-sentence order said nothing about takings or the government's need to keep the evidence for a possible retrial; it gave no reasoning at all. Nor could claim preclusion have barred this claim, even if the officials had raised it, because Rule 588 motions are the wrong vehicle for seeking just compensation for a taking. *Compare* Pa. R. Crim. P. 588 (authorizing only "the return of the property"), *with Dep't of Transp. v. A & R Dev. Co.*, 2020 WL 1130855, at *6 (Pa. Commw. Ct. Mar. 9, 2020) (explaining that Pennsylvania's "Eminent Domain Code … is the exclusive remedy for a de facto taking").

Next, the government says *Bennis v. Michigan* forecloses this claim. *Bennis* held that the government need not compensate the owner when it has "lawfully acquired" property in reliance on its police powers, rather than "eminent domain." 516 U.S. 442, 452 (1996). No one doubts that the government seized the guns under its literal police powers. And because it had a valid warrant, it says it lawfully acquired the guns too.

But *Bennis* applies only when the government gains title to the property. There, formal ownership of the property had been "transferred by virtue of [a forfeiture] proceeding from [the owner] to the State." *Id.* Here, by contrast, the government has never "lawfully acquired" title to the guns; they still belong to the parents. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (confirming that a taking happens "when[ever] the government physically takes possession of property without acquiring title to it"). Plus, the guns are not forfeitable as contraband, instrumentalities, or proceeds of a crime. They are, at most, potential evidence, and police do not gain title to "mere evidence." *Warden v. Hayden*, 387 U.S. 294, 306 n.11 (1967). So *Bennis* is no obstacle to the parents' takings claim.

## B. The warrant does not immunize officials who keep property this long

The officials have one last card to play: they seized the parents' property under a judicial warrant. *See Warden*, 387 U.S. at 301–02 (letting police seize evidence under search warrants). The seizure, the parents agree, was valid. And warrants can shield officials from liability.

6

But not for this long. Though valid warrants immunize officers who stay within their scope, they are not blank checks. *See Bruce v. Rawlins*, 95 Eng. Rep. 934 (KB 1770) (letting officers be sued for trespass when a search under a writ of assistance turned up nothing); *see also* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 586–89 (1999) (noting that trespass liability for valid yet unsuccessful search warrants was "an aspect of common law … well known at the time of the framing"). *But cf.* Fabio Arcila, Jr., *The Death of Suspicion*, 51 Wm. & Mary L. Rev. 1275, 1284 & nn.15–16 (2010) (noting a debate over how much immunity warrants and writs of assistance conferred). They are a limited exception to the rule against taking private property.

And that exception applies narrowly. At the Founding, warrants authorized taking property tied to a particular crime or wrong—hence the Fourth Amendment's requirement of probable cause. So warrants had to "particularly" identify the "things to be seized," and those "things" had to be tied to the crime for which there was probable cause. U.S. Const. amend. IV; *see* Davies at 601, 651–52. And though officers could also take evidence not listed in the warrant, it still needed to be "material as evidence *on the charge made against the prisoner*." *Rex v. Barnett*, 172 Eng. Rep. 563, 564 (CP 1829) (emphasis added); *see also Crozier v. Cundey*, 108 Eng. Rep. 439, 439 (KB 1827) (letting officers seize items not mentioned in the warrant only if those items were "likely to furnish evidence of the identity of the articles stolen and mentioned in the warrant"). If officers exceeded these limits, they would be liable. Thus, at the Founding, warrants immunized officers from trespass suits only for seizing evidence tied to a particular charge.

Because the point of seizing evidence is to use it in a criminal proceeding, the government may hang onto it through that proceeding. *See, e.g.*, Kensington Dist. N. Liberties, Pa., Act of Mar. 28, 1787, 2 Smith 401, § XII (letting the government keep seized gunpowder until a court decided whether it was lawfully possessed). And at the Founding, that proceeding would have ended by the time the conviction was final, not after the prisoner had exhausted collateral review. Indeed, collateral review was historically a civil remedy treated as a matter of legislative grace, not an integral part of the criminal process. *See, e.g.*, *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 202, 209 (1830) (Marshall, C.J.) (holding that the writ of habeas corpus "excepts from those who are entitled to its benefit … persons convicted" by "a court of competent jurisdiction"); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1520–21 (2022) (tracing the history of "permissive," not "mandatory," grants of habeas power to courts).

Thus, the warrant immunizes the officers who first seized the guns. But after the conviction became final, the warrant's justification ran out. "It is well settled that the government is permitted to seize evidence for use in investigation and trial, but that such property must be returned once criminal proceedings have concluded, unless it is contraband or subject to forfeiture." *United States v. Chambers*, 192 F.3d 374, 376 (3d Cir. 1999); *accord United States v. Francis*, 646 F.2d 251, 262 (6th Cir. 1981).

If the government wants to keep the property after the conviction becomes final, it needs some justification. That is why it may keep contraband, property that is illegal to own. It may

also keep the proceeds of the crime or the instrumentalities used to commit it. *See* 21 U.S.C. §853; *Kaley v. United States*, 571 U.S. 320, 323 (2014). But it may do that only after going through one of two processes. First, it may use criminal forfeiture to get the proceeds or instrumentalities as "an element of the sentence imposed *following conviction*." *Libretti v. United States*, 516 U.S. 29, 38–39 (1995) (second word of emphasis added). In other words, it must first prove the owner's guilt at trial. *United States v. Sandini*, 816 F.2d 869, 873 (3d Cir. 1987).

Or the government may use civil forfeiture to take the property even without convicting the owner. *See United States v. U.S. Currency in the Amount of $145,139.00*, 18 F.3d 73, 75 (2d Cir. 1994). But even then, the government must have at least probable cause to link the property to the crime. *See, e.g.*, *United States v. $10,700.00*, 258 F.3d 215, 222 (3d Cir. 2001) (analyzing 19 U.S.C. §1615).

The parents' guns fall into none of these categories. The police have never said the guns are contraband. Nor have they tried to forfeit them. A new warrant or other proof of continued compliance with the Fourth Amendment could justify retention for collateral review, say, or a new investigation or prosecution. But the government offers no such justification. When we asked the district attorney's lawyer if there would be probable cause to seize the guns today, he conceded, "I would think not." Oral Arg. Tr. 41:18–42:11. Because the government has not compensated the parents for the guns either, their takings claim may proceed.

We need not decide when, after the criminal case, this liability accrues and whether the plaintiff must first demand return of the property and be refused.

### III. BY HOLDING ON TO THE PARENTS' GUNS AFTER THE CRIMINAL CASE ENDED, THE OFFICIALS INFRINGED THEIR RIGHT TO KEEP ARMS

The Second Amendment guarantees "the right of the people to keep and bear Arms." According to the parents, the officials validly *seized* their guns under a warrant, but violated that right by *refusing to return* them. To decide that claim, we ask whether the constitutional text and "this Nation's historical tradition" permit holding on to the guns. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022) (abrogating *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), which set forth our previous framework for evaluating Second Amendment challenges). They do not. We hold that unless an exception applies, the Second Amendment protects a person's right to keep his lawfully owned guns.

### A. The Second Amendment's text protects a person's right to keep his own guns for self-defense

Start with the constitutional text: "keep … Arms." The Second Amendment secures an individual right to "have weapons" on hand. *District of Columbia v. Heller*, 554 U.S. 570, 582, 592 (2008) (defining "keep"). So aside from a few exceptions, the government may not prevent citizens from buying and owning guns. *Id.* at 628–29.

Nor may it barge into a home, seize guns, and keep them beyond the scope of a warrant or other authorized seizure. By

10

protecting the "keep[ing of] … Arms," the Second Amendment ensures that the People may "retain" their firearms "in [their] custody." *Keep* (defs. 1 & 2), Samuel Johnson, *A Dictionary of the English Language* (1755); *see also Keep* (defs. 1 & 2), Noah Webster, *American Dictionary of the English Language* (1828) ("[t]o hold; to retain in one's power or possession").

The government may not "infringe[ ]"on this right. U.S. Const. amend. II. That guarantee, of course, forbids "destroy[ing]" the right by banning gun ownership. *Infringe* (def. 2), Samuel Johnson, *A Dictionary of the English Language* (1755). But it also forbids lesser "violat[ions]" that "hinder" a person's ability to hold on to his guns. *Id.* (defs. 1 & 2); *accord Infringe* (defs. 2 & 3), Noah Webster, *American Dictionary of the English Language* (1828). Indeed, the Supreme Court recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded justification. *Bruen*, 142 S. Ct. at 2131–33.

That approach makes sense. With other constitutional rights, we scrutinize not only total bans but also lesser restrictions and burdens. Thus, we may be skeptical of public-health rules that cap how many people may physically attend church, even if the rules do not ban them from worshipping. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Or an execution protocol that lets a chaplain into the execution chamber but stops him from praying out loud. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1274 (2022). Or a law that criminalizes flag burning without regulating spoken or written words. *See Texas v. Johnson*, 491 U.S. 397, 402–03, 419–20 (1989). Even if the government has not entirely

prevented citizens from speaking or worshipping, its burdens on speech and worship may violate the First Amendment.

Likewise, the Second Amendment prevents the government from hindering citizens' ability to "keep" their guns. Here, retaining the parents' "entire collection of guns" hinders their ability to hold on to it. Oral Arg. Tr. 27:18–19. So the government "infringed" on the parents' right to "keep" their arms when it began holding on to the guns indefinitely. The seizure under a valid warrant immunized the government for the duration of the criminal case. But now that the case is over, the government must either get another warrant or return the property.

## B. History confirms the parents' Second Amendment right to get their guns back

The history bears this out. The ratifiers of both the Second Amendment and the Fourteenth Amendment (which secures the right in the states) understood that arbitrary seizures prevent citizens from keeping arms for their self-defense. *Cf. McDonald v. City of Chicago*, 561 U.S. 742 (2010) (incorporating the right to keep arms against the states).

The seeds of the Second Amendment were planted centuries ago in England, when King Charles II authorized his officers "to search for and seize all Armes in the custody or possession of any person" whom they considered dangerous. An Act for ordering the Forces in the several Counties of this Kingdom, 13 & 14 Car. II, c.3, § XIII (1662); *see also* Stephen P. Halbrook, *That Every Man Be Armed* 43, 210 n.40 (1984) (noting that a 1670 ban on commoners' owning guns and bows was

12

used "to justify breaking and entering houses to search for arms"); Joyce Lee Malcolm, *To Keep and Bear Arms* 23–53 (1994) (discussing various seventeenth-century seizures).

After Charles II was deposed, the English Bill of Rights guaranteed the right of Protestants to "have arms for their defence suitable to their conditions, and as allowed by law." Bill of Rights, 1 W. & M., ch. 2, §7, *in* 3 Eng. Stat. at Large 441 (1689); *see* Malcolm, *To Keep and Bear Arms* 115–21 (summarizing parliamentary debates).

Like Englishmen, colonial Americans feared arbitrary gun seizures. In 1774, with tensions rising, the Crown "instituted a general policy of searching places [in the Boston area] for arms and seizing them." Stephen P. Halbrook, *Encroachments of the Crown on the Liberty of the Subject: Pre-Revolutionary Origins of the Second Amendment*, 15 U. Dayton L. Rev. 91, 105 (1989). The Crown's efforts to search and disarm colonists continued over the next two years. Indeed, "[t]he British attempt to seize or destroy the arms and ammunition at Lexington triggered the" Revolutionary War. Halbrook, *That Every Man Be Armed* 62.

Plus, the Fourteenth Amendment's ratifiers understood that it would stop gun seizures. Before the Civil War, black people had been denied citizenship and, with it, the right "to keep and carry arms." *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857). Though *Dred Scott* fell with the Confederacy, Southerners kept seizing the freedmen's guns. *Heller*, 554 U.S. at 615. In Mississippi, white militias "seized every gun and pistol found in the hands of the (so called) freedmen," insisting that state law did not recognize their right to arms. Halbrook, *That Every*

*Man Be Armed* 117 (quoting a *Harper's Weekly* column); *accord McDonald*, 561 U.S. at 772. So too in South Carolina, where a former federal official reported similar seizures to Congress. H.R. Rep. No. 39-30, pt. 2, at 229 (1866), *quoted in* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. Rev. 1359, 1447–48. As one senator put it, "the greatest outrages are perpetrated by armed men who go up and down the country searching houses, disarming people, committing outrages of every kind and description." Cong. Globe, 39th Cong., 1st Sess. 915 (1866), *quoted in McDonald*, 561 U.S. at 772.

In response, the federal government took pains to explain to freedmen that "no military or civil officer ha[d] the right or authority to disarm" them. Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866–1876*, at 19 (1998) (quoting a Freedmen's Bureau circular). Against this backdrop, Congress passed the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1871 to protect all citizens' constitutional rights, including the right to arms. *Id.* The Fourteenth Amendment was designed to secure that right as well. *McDonald*, 561 U.S. at 772–76.

## C. The narrow historical exceptions do not justify holding on to the guns

As this history shows, the government may not ordinarily seize and hold on to weapons. There are few exceptions to that rule, and none applies here.

For instance, the government may confiscate guns from those who have been convicted of serious crimes or committed

dangerous acts. *Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016) (en banc) (plurality opinion), *abrogated on other grounds by Bruen*; *see Heller*, 554 U.S. at 626–27 (dictum). But the parents have neither been convicted of any crime nor committed any dangerous act.

The government may also seize and forfeit guns used to commit a crime. But that does not help the government here either. It first seized the parents' guns under a warrant. But that warrant was tied to the son's trial; as explained, its immunity ran out by the time the parents sued. And the government has not gotten and cannot get another warrant because it admits that there is no probable cause. So the parents had the right to keep the guns that they had lawfully bought and still lawfully owned. When the government took the parents' guns and refused to return them, it burdened that right.

Pushing back, the government cites other authority suggesting that seizures do not burden Second Amendment rights as long as citizens can "retain[] or acquir[e] other firearms." *Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011); *see also Houston v. City of New Orleans*, 675 F.3d 441, 445 (5th Cir.), *vacated*, 682 F.3d 361 (5th Cir. 2012); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571–72 (7th Cir. 2014); John L. Schwab & Thomas G. Sprankling, Houston, *We Have a Problem: Does the Second Amendment Create a Property Right to a Specific Firearm?*, 112 Colum. L. Rev. Sidebar 158 (2012).

The government notes that the Takings and Due Process Clauses more clearly protect private property. *Walters*, 660 F.3d at 317; Schwab & Sprankling at 167–68. So, it suggests, the Second Amendment provides "not a property-like right to

a specific firearm," but just a general right to buy guns. *Houston*, 675 F.3d at 445.

We disagree. We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere. Just as those seizures and retentions can violate the First Amendment, seizing and holding on to guns can violate the Second. The Second Amendment may let the government outlaw specific types of weapons—perhaps "dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (dicta); *accord Bruen*, 142 S. Ct. at 2143; Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1548 (2009). But as we have explained, it does forbid unjustifiable burdens on the right to "keep" one's own arms.

And that protection is not redundant of more property-focused protections. For instance, the Takings Clause allows seizures so long as the government pays "just compensation." But the Second Amendment appears to forbid "disarm[ing] private citizens" even if the government compensates those citizens for their property. *Cf. Heller*, 554 U.S. at 591–92. The other guarantees do not prevent this one from applying too.

## IV. PENNSYLVANIA GAVE THE PARENTS DUE PROCESS

Finally, the parents claim that the government violated their due process rights by holding on to their guns. They insist that they were entitled to process before the deprivation. And they say the deprivation happened when the government held on to

16

their guns after the criminal case, not when it first seized them. Thus, they claim that process was due after seizure but before retention.

We disagree. True, we usually require that the government give process before it deprives people of their property. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). But if that is not "feasibl[e]," it may give process after the deprivation. *Id.*

The core of due process is an "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). The parents got that opportunity here: They sought the return of their property under Pennsylvania Rule of Criminal Procedure 588, the state analogue to Federal Rule of Criminal Procedure 41(g). Doing so entitled them to a hearing at which they could introduce evidence. Pa. R. Crim. P. 588(B). The hearing was conducted by a judge, and the parents had the assistance of a lawyer. They could have appealed that judge's decision, but did not. *See, e.g.*, *Commonwealth v. Durham*, 9 A.3d 641, 642 (Pa. Super. Ct. 2010).

This process was all that was due under *Mathews*. *See* 424 U.S. at 335. The parents' Second Amendment right makes their private interest substantial. But the extensive process minimized the risk of erroneous deprivation. So Pennsylvania's scheme is "constitutionally adequate." *Zinermon*, 494 U.S. at 126.

The parents parry with two out-of-circuit cases, yet neither saves their claim. One case rejected a post-deprivation replevin suit as inadequate. But it did so because Missouri made the gun

17

owner sue in four counties. *Lathon v. City of St. Louis*, 242 F.3d 841, 844 (8th Cir. 2001). Pennsylvania, by contrast, lets owners simply file a motion. Pa. R. Crim. P. 588. The other case did hold that post-deprivation tort suits are generally inadequate. *Walters*, 660 F.3d at 313. But the Eighth Circuit has since walked that case back. *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 928–29 (8th Cir. 2016).

Because it was infeasible to give process before deprivation, and because the process the parents got was robust, we will affirm the District Court on this point.

## V. THE PARENTS MAY NOT SEEK DAMAGES AGAINST THE STATE POLICE

The Pennsylvania State Police is an arm of the Commonwealth of Pennsylvania. So the parents may not sue the police for money damages. *Ex parte Young*, 209 U.S. 123, 151 (1908). All they may seek is an injunction. *See id.* at 159; Oral Arg. Tr. 3:25–4:12 (conceding the point).

In reaching this conclusion, we hold that states must specifically authorize takings claims *for compensation*. True, Congress has authorized takings suits against states. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2168, 2176–77 (2019). But that does not mean that plaintiffs may seek compensation. That is because the Takings Clause, as incorporated against the states, did not alter the states' traditional immunity from federal suits, at least if state courts remain open to hear these claims. *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 734–35 (6th Cir. 2022); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) (collecting cases). Pennsylvania's Eminent Domain

18

Code opens its state courts to takings claims. *Knick,* 139 S. Ct. at 2168. Unless Pennsylvania decides that it prefers to pay damages to compensate owners for takings, federal plaintiffs like the parents may get only a declaration and injunction requiring the state to return their property.

\* \* \* \* \*

The police understandably seized the parents' guns in 2014 while a killer was still at large. But he has long since been captured and convicted, and his conviction has been affirmed. The judicial warrant does not authorize keeping the guns past this point. The Constitution requires the officials who are holding on to the guns to pay the parents just compensation and bars them from keeping the guns indefinitely. So we will reverse the District Court's dismissal of the Takings and Second Amendment claims. But because the parents got enough process, we will affirm the dismissal of their procedural-due-process claim.