NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0416n.06

Case No. 22-1414

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 29, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| GERALD S. OSTIPOW, individually and as Personal Representative of the Estate of Royetta L. Ostipow, | ) ) ) ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| WILLIAM L. FEDERSPIEL, | ) ) | OPINION |
| Defendant-Appellee. | ) ) | |

BEFORE: BATCHELDER, GIBBONS, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** Fifteen years ago, Saginaw County officials seized Gerald and Royetta Ostipow's property. Despite invoking both state and federal remedies, plaintiff Gerald Ostipow, individually and on behalf of Royetta's estate, has yet to be compensated for that seizure. Previously, we held that Ostipow's recourse was through the Michigan state system, not the federal courts. Back before us, Ostipow again faults Sheriff William Federspiel for failing to provide Ostipow the compensation he says is due. This prolonged denial, Ostipow claims, amounts to fresh violations of the Takings Clause as well as substantive due process. We disagree and affirm the district court's decision awarding summary judgment to Federspiel.

**I.**

The facts of this case are mostly as they were before. *See Ostipow v. Federspiel* ("*Ostipow I*"), 824 F. App'x 336, 338–40 (6th Cir. 2020). The crux of the dispute is the state's

seizure of the Ostipows' farmhouse and property. *Id.* at 338. Seemingly unbeknownst to his parents, the Ostipows' son had converted the farmhouse into a grow house. *Id.* Eventually, the police arrested him, resulting in various drug-crime convictions and leading prosecutors to seize the family property. *Id.* at 338–39. The Saginaw County Circuit Court entered an order of forfeiture, pursuant to which the seized property was sold. *Id.* at 339. After multiple state court appeals, the Ostipows received a judgment entitling them to some proceeds from the sale. *Id.*

With that judgment in hand, and with no payment forthcoming, the Ostipows previously pursued Takings Clause and substantive due process claims, among others, against Federspiel in the district court. *Id.* The district court granted summary judgment to Federspiel, *id.* at 339–40, a decision we affirmed. *Id.* at 347. Instructive there was *Bennis v. Michigan*, 516 U.S. 442, 452–53 (1996), which, we noted, held that "a state's seizing and retaining property as part of a criminal investigation is not a 'taking' for a 'public purpose' under the Fifth Amendment." *Ostipow I*, 824 F. App'x at 341. Nor, we observed, is there a "right to instantaneous satisfaction of a judgment when a governmental entity is involved." *Id.* at 345. Accordingly, we directed Ostipow and Federspiel to use the state law mechanisms available to them in the hopes of "expeditiously" resolving their dispute. *Id.* at 344.

Our hopes seemingly were just that. Eight months passed without much change to the status quo. Then, Gerald Ostipow returned to state court, filing a new suit against Federspiel, one Federspiel removed to federal court. Ostipow realleged federal takings and substantive due process violations and added two state law claims. Relying mainly on our *Ostipow I* opinion, the district court granted Federspiel summary judgment and declined to exercise supplemental jurisdiction. Ostipow timely appealed.

**II.**

On balance, we agree that Federspiel is entitled to summary judgment. Ostipow's takings claim is foreclosed by our earlier decision, and his substantive due process claim fails for many of the same reasons. We take the issues in turn.

A.

The legal backdrop for this long-running dispute is the Fifth Amendment's bar (as incorporated against the states through the Fourteenth Amendment) on the government's taking private property for public use without just compensation. U.S. CONST. amends. V & XIV; *see also Chicago, B. & Q.R. v. City of Chicago*, 166 U.S. 226, 241 (1897). When a government taking occurs, a property owner may invoke 42 U.S.C. § 1983 to "sue the government . . . in federal court" to ensure that the property owner does in fact get paid. *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019). As with other § 1983 suits, however, the governmental defendant may invoke qualified immunity to favorably resolve the suit before trial. *Ostipow I*, 824 F. App'x at 341. That is the tack Federspiel takes here.

Under the familiar qualified immunity framework, Ostipow must show both that Federspiel took his private property for public use without just compensation and that it was clearly established that his actions ran afoul of the Fifth Amendment at the time they occurred. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Critically, we do not write on a clean slate. And that history largely forecloses Ostipow's taking claim. *Ostipow I*, 824 F. App'x at 340–44. As we previously explained, "a state's seizing and retaining property as part of a criminal investigation is not a 'taking' for a 'public purpose' under the Fifth Amendment, and thus does not give rise to a claim for just compensation." *Id.* at 341.

3

That decision has preclusive force today. Parties who receive a final merits decision by a court of competent jurisdiction are precluded from relitigating claims that were or could have been raised in the earlier proceeding. *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997). Our prior holding resolved in Federspiel's favor the merits question of whether Ostipow could prove Federspiel's actions violated the Fifth Amendment. *Ostipow I*, 824 F. App'x at 342. Settled principles bar Ostipow from relitigating that question today.

That said, we previously emphasized that Ostipow possessed a state court judgment entitling him to compensation related to the seizure. We left it to the parties to ensure the judgment's enforcement. *Id.* at 343–44 (noting that Ostipow could pull the available Michigan law levers to "ensure the satisfaction of [the] judgment."). Yet relief does not appear to be forthcoming.

Ostipow attributes that delay to Federspiel's "chang[ing] [his] mind after *Ostipow I*" about his commitment to compensate Ostipow. Appellant's Br. at 21–22. Even if true, that development does not alter our Fifth Amendment analysis. Both then and now, Ostipow at bottom seeks just compensation for the retention of the family's farmhouse and its contents seized as part of a criminal investigation. *See McCarthy v. City of Cleveland*, 626 F.3d 280, 284 (6th Cir. 2010) ("A physical taking occurs when the government physically intrudes upon a plaintiff's property.") (quotation omitted). We have already said that those events alone do not give rise to a federal claim for compensation. *Ostipow I*, 824 F. App'x at 342. Now, as before, "a judgment against a government entity is not a right to payment at a particular time." *Id.* at 343. At day's end, Ostipow still holds a judgment entitling him to payment—one unconnected to his Takings Clause claim— that he can enforce in state court. But so far, at least, he has seemingly chosen against doing so.

Instead, Ostipow continues to believe his remedies are in this federal forum. For support, he cites two out-of-circuit cases holding that retention of property seized according to the state's police powers can itself be a taking, if those powers no longer justify the retention. *See Jenkins v. United States*, 71 F.4th 1367, 1373 (Fed. Cir. 2023) ("While the United States' police power may insulate it from liability for an initial seizure, there is no police power exception that insulates the United States from takings liability for the period after seized property is no longer needed for criminal proceedings."); *Frein v. Pa. State Police*, 47 F.4th 247, 252–53 (3d Cir. 2022) ("[T]he government is permitted to seize evidence for use in investigation and trial, but that such property must be returned once criminal proceedings have concluded, unless it is contraband or subject to forfeiture.") (citation omitted). Assuming these recent cases correctly identify the contours of the Fifth Amendment, Ostipow was late to raise the point. The police power, after all, would have ceased to justify Federspiel's retention of his property once Ostipow's son's criminal proceedings concluded, a point that had already passed by the time of *Ostipow I*. Yet by and large, Ostipow never argued in our earlier case—nor in this case (until his reply brief on appeal)—that his son's conviction marked the moment the police power could no longer be relied on to justify retention of the Ostipows' property. In other words, both preclusion and forfeiture principles likely bar the argument Ostipow makes now. *See Bragg v. Flint Bd. of Educ.*, 570 F.3d 775, 776 (6th Cir. 2009) (claim preclusion); *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (forfeiture).

Ostipow faces a second, equally significant, hurdle. To overcome Federspiel's assertion of qualified immunity, the purported constitutional rule violated by the sheriff needed to be clearly established in our circuit at the time of the violation. *Pearson*, 555 U.S. at 231–32; *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 481 (6th Cir. 2022) ("[W]e look to the law at the

time of the officer's conduct[.]"); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) ("We begin with, and could end with, the reality that [the plaintiff] points to no Supreme Court or Sixth Circuit case" that clearly establishes an officer's conduct was unconstitutional). And the two opinions Ostipow highlights are neither ours nor the Supreme Court's. Nor, for that matter, could they reflect any manner of established law before the first one issued just last year. So even without his preclusion and forfeiture problems, Ostipow could not satisfy the clearly established prong of the qualified immunity test.

B.

That leaves Ostipow's substantive due process claim. To prevail, he needs to demonstrate a constitutionally protected interest that was infringed by arbitrary and capricious state action. *Golf Vill. N. v. City of Powell*, 42 F.4th 593, 601 (6th Cir. 2022). In the context of this case, he needs to show that the seizure and retention of the family property by the state was "so brutal and offensive that [those actions] do not comport with traditional ideas of fair play and decency." *Id.* (brackets and quotations omitted) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). As already explained, any claims stemming from the initial seizure or retention of the family property following their son's conviction would be foreclosed by *Ostipow I*. Substantive due process claims alleging that the continued retention of the Ostipows' property was arbitrary and capricious, however, present a distinct issue that would not be precluded by earlier litigation. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016); *see also id.* at 2335 (Alito, J., dissenting) (describing the proposition that "a prior judgment does not preclude new claims based on acts occurring after the time of the first judgment" as "unremarkable").

That begs the question whether Federspiel's continued failure to even attempt to pay Ostipow fits the latter description. To our minds, it does not. *See Golf Vill. N.*, 42 F.4th at 602

(denying substantive due process violation where plaintiff sought relief for defendant's refusal to act "without the benefit of complete information" because plaintiff did not do their part). Remember that Federspiel is currently subject to a state court judgment that merely requires that he give Ostipow whatever compensation is just. The judgment does not tell him the amount owed. Nor does it (or, for that matter, our earlier order) necessarily task Federspiel with figuring out what amount would be just. Federspiel left the Ostipows to decide whether (and, if so, how) to seek reimbursement. While another state official may have acted in a different manner, Federspiel's purported inaction in the face of uncertainty is hardly extreme enough to constitute a violation of substantive due process. *See id.*

Ostipow argues otherwise. Part of the egregiousness, he says, was Federspiel's "duty (and promise)" to "figure out how and how much to pay" him. But neither a duty nor a promise has been established. The underlying state court order supposedly imposing that duty merely indicated that it was Federspiel's duty to pay the Ostipows what they were owed. The "how and how much" questions were left to the parties jointly, with the order anticipating that the parties would resolve the issue during settlement negotiations. And because we look only to events that happened after *Ostipow I*, it is worth reiterating that, by order, the duty to iron out those details was assigned to the parties jointly, not Federspiel alone. 824 F. App'x at 344. It does not shock the conscience to hold off on paying another until it is clear how much is owed. *See Golf Vill. N.*, 42 F.4th at 602.

\*     \*     \*     \*     \*

We understand Ostipow's frustration as his decade-and-a-half search for reparations continues. But those efforts must pick back up elsewhere, perhaps with another look at Michigan's laws relating to the enforcement of its courts' judgments. The district court's judgment is affirmed.

7